# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF TEXAS
# FORT WORTH DIVISION

| | | |
|---|---|---|
| **MICHAEL LE and DUNG LE,** | § | |
| | § | |
| **Plaintiffs,** | § | |
| | § | |
| **v.** | § | **Civil Action No. 4:22-cv-00147-O** |
| | § | |
| **UNITED STATES OF AMERICA,** | § | |
| | § | |
| **Defendant.** | § | |

## <u>MEMORANDUM OPINION AND ORDER</u>

This personal injury lawsuit is the result of a car accident involving a United States Postal Service truck and a vehicle driven by Plaintiff Michael Le, who is now a quadriplegic. Mr. Le and his wife, Dung Le ("Plaintiffs"), sued the United States of America under the Federal Tort Claims Act, 28 U.S.C. §§ 2671–2680, for damages they've suffered and continue to suffer as a result of the tragic incident that occurred in May of 2018. In response, the United States claims that Mr. Le and his spinal surgeon, Dr. Matthew Berchuck, were the negligent actors in this case. During the week of April 24, 2023, the Court conducted a four-day bench trial regarding the claims and defenses made by the parties in this matter that included the testimony of Mr. Le, who was transported to the Courthouse by ambulance.[1] While the parties contest most of the underlying facts and import of the evidence presented in this case, the dispute ultimately turns on two essential questions: (1) who is at fault for causing Mr. Le's quadriplegia and, if the United States is to blame, (2) how much are the Les to be compensated for the harm they've endured?

---

[1] Both parties were represented by attorneys of the highest caliber, who advocated for their clients with diligence and excellence. Given the complexity of the factual and legal issues presented in this case, the Court is grateful for the hard work of counsel on both sides, who exemplify the very best of the legal profession.

The following findings of fact and conclusions of law are based upon the evidence presented at trial, including the Court's observation of the witnesses and their relative credibility; the parties' arguments and post-trial supplemental briefing; and applicable authorities. Having considered the entire record, the Court rules against the United States and in favor of Plaintiffs on their claim of negligence under the FTCA and concludes that the United States is jointly and severally liable for all of Plaintiffs' recoverable damages.

## I.   FINDINGS OF FACT[2]

On May 4, 2018, Plaintiff Michael Le was a 47-year-old man with a pre-existing condition of ankylosing spondylitis, a spinal disease that can lead to the spine becoming rigidly fused together over time, that makes the spine more susceptible to fractures at low levels of force, and can result in highly unstable fractures when they do occur. At advanced stages, this spinal fusion may lead to a kyphotic deformity such that the patient has a "pitched forward" or bent over posture, with their chin near their chest. At the time of the accident, Mr. Le was suffering from advanced untreated ankylosing spondylitis, which was evident from his hunched-forward posture that restricted his upward gaze and prevented him from standing up straight. Despite the severity of his condition, Mr. Le was employed and engaged in the usual activities of daily living such as cleaning, lawn maintenance, driving, and grocery shopping. Mr. Le also engaged in regular physical exercise, such as throwing the baseball with his son and running a mile on the track several times a week. Nor did his condition prevent him from engaging in common family activities like eating out at restaurants, going out in the community with his family, vacationing, traveling to his son's baseball tournaments, and visiting family abroad.

---

[2] For purposes of this Opinion, any of the Court's findings of fact that also constitute a conclusion of law is adopted as such, and any conclusion of law that also constitutes a finding of fact is adopted as such.

### a. The Accident

On the rainy afternoon of May 4, 2018, Mr. Le left his home located at 2752 Excalibur

Drive in Grand Prairie, Texas to pick up his son from school, as he customarily did. He got into

his red Toyota that was parked in his driveway facing his house, with Excalibur Drive to the rear.

Though there is conflicting evidence on this point, Mr. Le testified that when he got into his car

he adjusted his mirrors and put on his seatbelt, as he does every time.[3] There is also a dispute

about whether he was wearing shoes at the time of the accident.[4] After backing to the edge of his

---

[3] Several of Mr. Le's family members confirmed that he is a habitual seatbelt-wearer, always putting on his seatbelt when he gets in the car. Mr. Le further testified that he removed his seatbelt before he got out of the car after the accident. Moreover, multiple records—including that of the responding police officer and some of the responding EMTs—note that Mr. Le was belted at the time of the accident.

The Government introduced evidence that Mr. Le was not wearing his seatbelt in support of their claim that Mr. Le was contributorily negligent in causing his injuries. The Government's primary evidence that Mr. Le was not wearing his seatbelt is an image showing that a plastic piece of the interior frame of the car (the B-Pillar) is missing and that the seatbelt is fully coiled in its unbelted position. According to the Government's expert, this indicates that the seatbelt pretensioner fired, locking the belt in whatever position it was in at the time that the airbag deployed. Both parties agree, however, that no tests were conducted on the seatbelt pretensioner in Mr. Le's vehicle, so there can be no conclusive answer about whether it actually fired.

And while the Government's expert testified that airbags and seatbelt pretensioners generally fire simultaneously, the vehicle owner manual for Mr. Le's Toyota expressly indicates that the "seatbelt pretensioner and SRS airbags may not operate together in all collisions." Leifer Test., Hr'g Tr. 147:9–10, ECF No. 140. Thus, in the Court's view, the evidence about whether Mr. Le was wearing his seatbelt during the successive collisions is inconclusive at best. However, because the Court does not find this fact dispositive for purposes of its causation analysis, the Court need not make a specific factual finding on this issue.

[4] Again, the Government introduced evidence that Mr. Le was not wearing shoes in support of their claim that Mr. Le was contributorily negligent in causing his injuries, arguing that his lack of shoes affected his ability to control his vehicle.

At trial, Mr. Le testified that he was wearing flip flop sandals on the day of the accident and body-camera evidence shows his sandals in the floorboard of the driver's side of the car after the accident. The evidence also shows that Mr. Le was walking around in socks after the accident. While this doesn't prove that he was not wearing shoes that afternoon—a person can put on sandals while wearing socks—it raises the question of whether his shoes were on at the time of the accident.

Even if the Government could show by a preponderance of the evidence that Mr. Le was not wearing shoes (and they have not), the Government has failed to show *how* the purported lack of shoe-wearing caused or contributed to Mr. Le's injuries, beyond simply making the assertion. As such, the Court need not make a specific factual finding on this issue.

driveway and before entering the street, Mr. Le stopped and looked in both directions for oncoming traffic. Seeing no cars coming from either direction, Mr. Le continued backing out of his driveway while turning the steering wheel so he could head to his left down the street, in the opposite direction of a community mailbox located a short distance down the street to his right. After his vehicle's front bumper cleared the sidewalk curb, Mr. Le came to a complete stop, shifted from reverse into drive, and began pressing on the accelerator pedal.[5]

At the same time, a USPS mail truck was stopped at the community mailbox approximately thirty feet away on the far side of the street, facing the opposite direction.[6] The driver, USPS employee Ms. Jill Williams, was in the driver's seat on the right-hand side of the vehicle. Ms. Williams was engaged in her mail delivery duties and was dropping off a package at the community mailbox. However, because the package would not fit in the mailbox, Ms. Williams needed to deliver it to the addressee's home a few houses behind her. But it was raining that afternoon. So rather than get out of the vehicle and deliver the package on foot or drive the long way around the block, Ms. Williams decided to drive the mail truck in reverse against the flow of traffic to deliver the package at the address a few houses to behind her.[7]

Though Ms. Williams says that she checked her mirrors before and while driving in reverse, the evidence indicates it is extremely difficult, if not impossible, to see behind the mail truck given the vehicle's substantial blinds spots, regardless of one's use of the mirrors. Indeed, a postal driver with nearly thirty years of experience indicated that delivery drivers simply "can't

---

[5] Both parties' accident reconstruction experts agree that Mr. Le's vehicle was completely stopped in the street before the postal truck struck his vehicle. *See* Andrews Test., Hr'g Tr. 72:23–73:1, ECF No. 138 (testifying for Plaintiffs); Danaher Test., Hr'g Tr. 239:14–240:6 (testifying for Defendant).
[6] Pls.' Ex. 55 (indicating USPS truck was parked 29' away); *see also* Andrews Test., Hr'g Tr. 105:10, ECF No. 138; Def.'s Ex.
[7] The parties' accident reconstruction experts estimate Ms. Williams' vehicle was traveling between 2.5 and 6 miles per hour at the time of the initial impact based on average backing speeds and the damage to both vehicles.

see behind the mail truck" when driving in reverse, even if expertly utilizing the mirrors.[8] Likely for this reason, among others, all USPS delivery drivers are trained never to drive in reverse unless absolutely necessary.[9] The vehicles are also equipped with prominent signage reminding drivers not to back up. While reversing down the street at a slow rate of speed, Ms. Williams' mail truck struck the right rear quarter panel of Mr. Le's Toyota.

After this first impact, Mr. Le accelerated his vehicle across his front yard, through his neighbor's privacy fence, and into the corner of his neighbor's house. The second impact slammed his vehicle to a halt and deployed the driver's side airbag. Though this second impact caused significant damage to the front of his Toyota, Mr. Le exited the vehicle, most concerned that he had damaged his neighbor's home. Having felt the first impact and overheard the second, Ms. Williams stopped her mail truck and got out to see if Mr. Le was alright. Minutes later, Grand Prairie Police and EMTs responded to the scene. Mr. Le agreed to undergo an initial medical examination in the ambulance but, not realizing the severity of his injury, ultimately refused transport to the hospital. At that point, his neck was hurting but he could still walk with some assistance. While police officers conducted an investigation and prepared an accident report, Mr. Le leaned against a car in his driveway, standing in a manner to keep weight off of his right leg. Eventually, however, Mr. Le lost the capacity to support his body weight and slumped to the ground. Because he had collapsed and was unable to stand, several individuals placed Mr. Le in a family car and his son drove him to a nearby hospital.

---

[8] Fegan Depo. Test., Hr'g Tr. 28:8–29:4, ECF No. 138 (indicating it is impossible to see what's behind USPS mail trucks even with use of the mirrors).

[9] Plaintiffs offered substantial evidence regarding the fact that Ms. Williams violated USPS policy by backing up her postal truck when it was unnecessary to do so, despite her training to the contrary. But the Court gives no consideration to Ms. Williams' violation of the policy because such a showing does not *itself* prove that Ms. Williams was therefore negligent. Rather, the Court considers the "Don't Back Up" policy—and Ms. Williams' training with respect to that rule—to determine whether, under the facts and circumstances of this case, a driver of a large vehicle with significant blind spots would be able to foresee causing harm to another person by driving the truck in reverse on a residential street.

### b. The Spinal Fracture

The parties vehemently contest the cause of this series of events. Neither party contests that, at some point during the accident, Mr. Le obtained a severe "chalk-stick" fracture in his C6 vertebra. A chalk-stick fracture, common in ankylosing spondylitis patients, is the colloquial name for a complete break or through-and-through fracture of the vertebra. What the parties do contest is when in the sequence of events that fracture occurred. Plaintiffs argue the first impact caused the fracture, which in turn caused an immediate but transient loss of neurological function in some of Mr. Le's extremities because of an injury to his spinal cord. This neurological injury, Plaintiffs allege, resulted in Mr. Le's inability to remove his foot from the already-depressed accelerator pedal, causing his car to accelerate across his yard, through a fence, and into his neighbor's house. By contrast, the Government argues that no fracture and spinal cord injury occurred during the first impact and that Mr. Le, either accidentally or voluntarily, pressed the accelerator pedal in response to the first collision and—for approximately six seconds and over more than ninety feet—drove his vehicle through the fence and into his neighbor's house at 20 miles per hour.

The Government contends it is only logical that the fracture occurred during the second, much more forceful impact. Because had Mr. Le's vertebra fractured during the first impact, the second high-velocity impact would have been a devastating event, rendering him an immediate quadriplegic. In the Government's view, because Mr. Le got out of the car and walked around for some time after the accident, the fracture could not have occurred during the first minor collision.

The Court finds that the weight of evidence supports Plaintiffs' theory of events. First, the parties' experts all agree that ankylosing spondylitis patients can acquire severe chalk-stick

fractures from very minor impacts. Indeed, many ankylosing spondylitis patients experience this kind of fracture by simply slipping and falling. For this reason, the fact that the first impact between Ms. Williams' mail truck and Mr. Le's car was relatively low force compared to Mr. Le's collision with his neighbor's house is of little import given Mr. Le's advanced disease and high degree of susceptibility to low-impact fractures. As Plaintiffs' spinal expert opined, Mr. Le's pre-existing condition was greatly aggravated by the relatively minor trauma of the initial collision.

Moreover, each of the parties' medically trained experts—every one of them—agrees that a chalk-stick fracture of the kind Mr. Le suffered *can* cause transient neurological dysfunction (fluctuating capacity to use and control one's extremities) as a result of a distressed or injured spinal cord. The parties' experts further agree that Mr. Le's neurological symptoms were in fact fluctuating due to a spinal cord injury near the time of the accident. This kind of neurologic injury can occur when, as here, the vertebra that normally encases and protects the spinal cord has been completely fractured, allowing its fragmented parts to shift. This in turn causes the fragments to pinch and release the spinal cord, causing transient neurological malfunction such as loss of control of one's extremities. Such nerve injuries can occur instantaneously, much like a light switch shutting off. As Plaintiffs' spinal expert opined, that the fracture and corresponding neurologic injury occurred at the first impact explains Mr. Le's stated inability to withdraw his right leg from the accelerator after being rearended.[10]

---

[10] During trial, Mr. Le testified about his inability to control his right leg and his confusion about what had occurred:

> Q.   And what happened next?
> A.   Next the car speed up a little bit and I couldn't -- I couldn't stop. I could not -- you know, I could not get my foot off the accelerator.
> Q.   Okay. Did you, in your mind, try to move your foot?

That the spinal cord injury occurred on the first impact is bolstered by the fact that Mr. Le accelerated nearly ninety feet and for approximately six seconds (one-one thousand, two-one thousand, three-one thousand, four-one thousand, five-one thousand, six-one thousand) across his lawn, through a fence, and into his neighbor's house without ever hitting his brakes. The evidence shows that a person's typical reaction time to a known event is a second and a half.[11] The Government does not dispute this, acknowledging that had Mr. Le panicked and accidentally hit his accelerator, his expected corrective response time would have been "probably more like one or two seconds."[12] And if indeed Mr. Le "had control" of his vehicle, "was actively steering," and "attempt[ed] to avoid hitting his own house," as the Government contends, there is very good reason to believe that in those intervening six seconds Mr. Le would have used his brakes had he possessed the physical capacity to do so.

---

A.    Yes. I try so much to move my right foot up to push on the brake, but I could not. I tried many time. I don't know why. I don't know why. I just could not lift up my right foot, you know --
Q.    And put it on the brake?
A.    -- put it on the brake.
. . .
Q.    During this time, did you attempt to convey to the police officer what you told us, that your foot wasn't working?
A.    Yes, sir.
Q.    At that time, did you understand that your foot actually wasn't working?
A.    No, sir. No, sir. You know --
Q.    What did you think at the time about your foot?
A.    I didn't know why I could not, but when the car -- you know, after the car hit the house, I suddenly get movement again.
        . . . And the police officer asked me what happened.
Q.    Yes.
A.    You know, because of the impact of the truck hit the car, I ran over the fence, and the car hit the house and popped the airbag. My mind say -- you know, I want to say, I could not stop the car. But I told the officer the car just speed up. When the car -- you know, then after, I can move my feet again. So I told the police, I just took my foot off. I just remember I could walk.

Michael Le Test., Hr'g Tr. 13:9–20, 16:2–17:17, ECF No. 140.
[11] Andrews Test., Hr'g Tr. 83:11–25, ECF No. 138 (noting that a person's typical reaction time is 1.5 seconds, assuming they are aware of the event necessitating a response).
[12] Def.'s Counsel Test., Hr'g Tr. 182:13, ECF No. 140.

Second, the evidence shows that Mr. Le's particular fracture pattern is consistent with a rear right-side impact—precisely the kind of impact that occurred in the initial collision. The evidence shows that during the first impact, Ms. Williams' postal truck struck Mr. Le's car on the rear right-hand side. And both parties' experts—all three that opined on this issue—agreed that, upon experiencing an impact from that angle, the vehicle occupant's head would have moved in the direction of the impact, or back and to the right, putting stress on the front left side of Mr. Le's neck vertebrae.[13] According to Plaintiffs' biomechanical expert Dr. DeLonga, a board-certified radiologist and Ph.D. in engineering, the images of Mr. Le's spinal injury reveal that the chalk-stick fracture was asymmetrical, with greater separation between the fragments on the left side of the vertebra than on the right, meaning that in all likelihood the fracture occurred at impact one.[14] Another of Plaintiffs' experts, Dr. McPherson, a board-certified orthopedic surgeon, independently reached the same conclusion.

Though Defendant's biomechanical expert, Mr. Storvik, ultimately opined that Mr. Le's fracture pattern was not consistent with the first collision, he reached that conclusion on grounds that the rearend forces of the first impact were "relatively nominal" compared to the forces of the second impact.[15] But the indisputable disparity of forces involved in the first and second impacts does not establish that Mr. Le's asymmetrical fracture must have occurred during the second impact. Indeed, Storvik acknowledged multiple times at trial that a fracture like Mr. Le's with greater front left-side displacement could be caused by hyperextension of the neck back and to

---

[13] DeLonga Video Dep. Test., at 00:29:30 (on file with the Court); McPherson Test., Hr'g Tr. 23:3–26:23, ECF No. 136 (confirming his belief as board-certified orthopedic surgeon that, with a high degree of medical probability, the fracture occurred at impact one); Storvik Test., Hr'g Tr. 295:17–297:20, ECF No. 139 (acknowledging that a rear right-side impact would cause a vehicle occupant's head to move back and to the right, straining the front left portion of the cervical spine).
[14] Pls.'s Ex. 42 (depicting the asymmetrical fracture).
[15] Storvik Test., Hr'g Tr., 269:6–25, ECF No. 139.

the right, movement that undoubtedly occurred in the first collision.[16] Finally, the Government's spinal expert, Dr. Colman, opined that, if Mr. Le experienced a chalk-stick fracture at the first impact, the second impact would likely have severed his spinal cord and rendered him an immediate quadriplegic. But Plaintiffs' spinal expert, Dr. McPherson, disagrees that such a catastrophic result would necessarily have occurred.[17] While a second trauma could be physically devastating, it is not necessarily so in every case.

Of course, it is possible that Mr. Le's C6 vertebra could have fractured during a high-impact frontal collision and airbag deployment like that which occurred during the second impact. No expert denies the plausibility of that potentiality. But that the fracture *could have* occurred during the second impact does not resolve the Court's vital inquiry about when the fracture *did* occur. Importantly, the Government admits it has no evidence about how Mr. Le's body was positioned in relation to the airbag during the second frontal impact. All the Government can offer is speculation that Mr. Le's body and head was positioned in such a manner that the second impact caused an asymmetrical fracture to his C6 vertebra by forcing his head back and to the right.

But the Court need not speculate about causation in this case because the evidence—the known forces involved in the right-side rearend collision, the radiology images reflecting an asymmetrical fracture consistent with those forces, and Mr. Le's reported inability to control his right leg—all points toward impact one as the moment of injury. In sum, after considering the evidence presented and the relative credibility of the witnesses, the Court finds that the weight of evidence demonstrates that Mr. Le's asymmetrical chalk-stick fracture is most consistent with

---

[16] *Id.* at 295:17–297:20; *see also id.* at 267:25–269:11 (noting hyperextension of neck to the right would put stress on left side of the vertebrae); *id.* at 280:21–281:1 (same).

[17] McPherson Test., Hr'g Tr. 36:3–20, ECF No. 136 (disagreeing that a successive trauma following an initial significant trauma will necessarily result in a catastrophic injury).

the forces involved in the first impact. Therefore, the Court finds that his injury occurred during the first collision.

### c. The Spinal Surgery & Post-Operative Care

After an examination at his local hospital, Mr. Le was transported that evening by helicopter to Baylor University Medical Center ("BUMC") in Dallas, where he was examined by orthopedic spine surgeon Dr. Matthew Berchuck. In Dr. Berchuck's estimation, Mr. Le was in a highly perilous condition given the severity of his fracture, his underlying spinal deformity contributing to potential displacement of the fracture, and an unsatisfactorily preserved neurological status. Though he recognized the situation as a true emergency, Dr. Berchuck made the decision to keep Mr. Le in the surgical intensive care unit overnight and postpone the surgery until the next morning, when a full medical staff was available to conduct the high-risk procedure.

When the surgery began, neuromonitoring systems that measure the integrity of the spinal cord indicated Mr. Le's motor and sensory potentials were normal. During the surgery and at Dr. Berchuck's instruction, the surgical team flipped Mr. Le from a partially supine position (on his back) to the prone position (face down) in preparation to operate on the back of the spine. Within seconds of the flip Dr. Berchuck was informed that the neuromonitoring signals had been lost, so he immediately returned Mr. Le to lying on his back. Importantly, both parties' spinal experts agree that the loss of neuromonitoring signals does not necessarily indicate that paralysis occurred at that moment, though it may. Indeed, as the Government's expert Dr. Colman acknowledged repeatedly, loss of neuromonitoring signals can occur for a number of reasons unrelated to spinal cord injury itself. After returning Mr. Le to his original position, Dr. Berchuck restabilized Mr. Le's spine with internal and external stabilization mechanisms—by

11

affixing an internal metal plate to the vertebrae near the site of the fracture to provide structural support and by fitting Mr. Le with an external Halo vest—to ensure the spinal cord was stabilized. Finally, Dr. Berchuck performed a visual inspection of the spinal cord to ensure it was decompressed. After taking these measures, Dr. Berchuck terminated the surgery. Despite these stabilization measures, Mr. Le's neurologic function never returned. Dr. Berchuck did not reattempt spinal surgery and, after a months-long hospital stay at BUMC, Mr. Le returned home a quadriplegic.

### d.  Mr. Le's Life After Surgery

Since his paralysis, Mr. Le has endured several health complications that have required recurring hospital stays and medical care to treat infections and manage pain. Among the many complications Mr. Le has suffered are a tear to his esophagus that eventually required his permanent use of a feeding tube, hospitalizations to address recurring illnesses, and amputation of his lower legs to address severe joint stiffness and immobility. Mr. Le is generally confined to his bed or wheelchair and rarely leaves his house due to the difficulty and expense of transporting him. Given his immobility, he requires around-the-clock care from his wife and sons and can fulfill none of the physical roles he provided for himself and his family prior to the accident. As a result, Mr. Le has suffered immense physical, mental, and emotional pain as a result of his tragic change in circumstances and greatly diminished quality of life. Mrs. Le has also endured and continues to endure mental and emotional pain as a result of her husband's suffering and has become the sole income-earner and, along with her family members, a primary caretaker of her husband.

## II.  CONCLUSIONS OF LAW

### a.  Jurisdiction & Venue

The Court has subject matter jurisdiction over Plaintiffs' claims for negligence and loss of consortium against the United States under the Federal Tort Claims Act ("FTCA"). 28 U.S.C. § 1346(b). Proper venue in this case lies in the Northern District of Texas under 28 U.S.C. §§ 1391(e), 1402(b) because the actions about which Plaintiffs complain occurred in this district at the Le family residence located at 2752 Excalibur Drive in Grand Prairie, Tarrant County, Texas. Because the accident involved a United States Postal Service truck and Mr. Le's personal vehicle, Plaintiffs can maintain this action against the United States under the FTCA, 28 U.S.C. §§ 2671–2680, which provides a limited waiver of sovereign immunity for tort claims involving federal employees. Plaintiffs exhausted the jurisdictional prerequisites of filing a claim with the appropriate federal agency at least six months prior to filing this suit. *Id.* §§ 2672, 2675. Under the FTCA, any remedy awarded is exclusively against the United States, meaning any civil action or proceeding for monetary damages against the federal employee herself is barred. 28 U.S.C. § 2679(b)(1). Because Ms. Williams was operating the USPS mail truck involved in the accident in the course and scope of her federal employment, Plaintiffs' suit is properly brought against the United States.

### b.  Legal Standards

Under the FTCA, the Court applies the substantive law of the state where the alleged negligence occurred, to the extent not precluded by federal law. 28 U.S.C. § 1346(b)(1); *Transco Leasing Corp. v. United States*, 896 F.2d 1435, 1450 (5th Cir. 1990) (citing *Richards v. United States*, 369 U.S. 1, 6 (1962)). Here, Plaintiffs claim that Ms. Jill Williams, the USPS delivery driver, negligently operated her postal truck, striking Mr. Le's vehicle and causing the fracture

that ultimately led to his quadriplegia. The Government counters with the argument that it was Mr. Le who was negligent by unsafely backing into the street, failing to wear his seatbelt, and subsequently driving his car into his neighbor's house in response to the initial collision. These negligent acts, the Government claims, bar Mr. Le from recovering against the United States because he is primarily responsible for the events that caused his spinal fracture. Finally, the Government contends that Dr. Berchuck's negligence during and after spinal surgery ultimately rendered Mr. Le a quadriplegic, further reducing any proportionate responsibility on the part of the United States, if any exists.

Because the alleged tortious conduct occurred in Texas, Texas state law governs all substantive legal questions. To prevail on a negligence claim under Texas law, a plaintiff must establish each of the following elements by a preponderance of the evidence: (1) that the defendant owed the plaintiff a specific duty; (2) that the defendant breached that duty; (3) that the breach caused the plaintiff's injuries; and (4) that the plaintiff suffered damages as a result of his injuries. *West Invs., Inc. v. Urena*, 162 S.W.3d 547, 550 (Tex. 2005).

However, if a defendant can prove that a plaintiff's own negligent conduct contributed to his injuries by more than fifty percent, the plaintiff is barred from recovering any damages from the defendant. Tex. Civ. Prac. & Rem. Code § 33.001. If the plaintiff's degree of contributory negligence is less than fifty percent, however, his recovery is simply reduced by his own proportional percentage of negligence. Tex. Civ. Prac. & Rem. Code § 33.012. Similarly, defendants are liable only for the portion of the plaintiff's injuries that reflect that defendant's percentage of responsibility, unless the defendant is more than fifty percent responsible. Tex. Civ. Prac. & Rem. Code § 33.013. In the latter case, the defendant will be jointly and severally liable for all of the plaintiff's recoverable damages. *Id.* Finally, Texas law also takes into account

14

any responsible third-parties who, while not considered liable, are still considered for purposes of calculating percentage of fault among all the parties. Tex. Civ. Prac. & Rem. Code § 33.003. A responsible third-party is "any person who is alleged to have caused or contributed to causing in any way the harm for which recovery of damages is sought, whether by negligent act or omission [or] by other conduct or activity that violates an applicable legal standard or by any combination of these." Tex. Civ. Prac. & Rem. Code § 33.011(6).

Here, the United States has designated Dr. Berchuck as a responsible third-party, meaning that if he is found to have been negligent in his treatment of Mr. Le or to have otherwise violated an applicable legal standard, the Government's percentage of responsibility and corresponding liability, if any, will be reduced accordingly. To prevail in its claim that Dr. Berchuck should be considered responsible for any part of Mr. Le's injuries, the Government must prove "(1) the physician's duty to act according to an applicable standard of care; (2) the physician's breach of that standard of care; (3) injury; and (4) causation." *Hannah v. United States*, 523 F.3d 597, 601 (5th Cir. 2008). As a threshold matter, the party asserting medical malpractice must establish through expert testimony the appropriate standard of care, with a focus on the community in which the treatment took place. *Id.*; *Quijano v. United States*, 325 F.3d 564, 568 (5th Cir. 2003).

### c.  Negligence

The Court first considers the parties' competing claims of negligence. To prevail, Plaintiffs must establish (1) the existence of a duty, (2) breach of that duty, and (3) that the breach proximately caused an injury (4) resulting in damages. *See Urena*, 162 S.W.3d at 550. They must also overcome the Government's defense that Mr. Le's own negligence is the cause of his injuries. The Court addresses each element in turn.

15

### i.  Duty

Every person has a duty to exercise ordinary and reasonable care in going about their activities in order to prevent foreseeable harm to others. *Hayes v. United States*, 899 F.2d 438, 444 (5th Cir. 1990) (applying Texas tort law to resolve an FTCA claim). Ordinary care is met where a person acts as a reasonably prudent person would under the same or similar circumstances. *See Williamson Co. v. Voss*, 284 S.W.3d 897, 902 (Tex. App.—Austin 2009, no pet.). Such a duty applies to drivers of motor vehicles, requiring them to operate their vehicle in such a manner as to avoid foreseeable injury to others, including maintaining a proper lookout and abiding by rules of the road such as yielding when necessary and backing only when it is safe to do so. *See Montes v. Pendergrass*, 61 S.W.3d 505, 509 (Tex. App.—San Antonio 2001, no pet.) (identifying duty to maintain proper lookout); *Carney v. Roberts Inv. Co., Inc.*, 837 S.W.2d 206, 210 (Tex. App.—Tyler 1992, writ denied) (identifying duty to observe the rules of the road and common experience); *McWilliams v. Muse*, 300 S.W.2d 643, 645 (Tex. 1957) (noting that even when a driver under a "statutory duty to yield . . . fails to do so, the exercise of ordinary care may require the operator of the other vehicle to yield"). In this case, both Ms. Williams and Mr. Le had a duty to operate their vehicles with ordinary care.

### ii.  Breach

Based on its earlier factual findings, the Court concludes that Ms. Williams breached her duty of ordinary care to Mr. Le. First, she breached her duty by choosing to drive her postal truck with substantial blind spots in reverse on a residential street, despite her knowledge that she should not back unless absolutely necessary. Indeed, the reason USPS has a "Don't Back Up" policy is the fact that the postal trucks are hard to see behind.[18] Second, having decided to drive

---

[18] Fegan Depo. Test., Hr'g Tr. 28:2–29:4, ECF No. 138 (indicating the reason USPS enforces the "Don't Back Up" policy is because it is nearly impossible to see behind the mail trucks); *see also* note 9 *supra*.

in reverse, she breached her duty by failing to keep a proper look out such that she could identify and avoid hitting Mr. Le's red Toyota—which had already been in the street long enough for him to have come to a complete stop, shift into drive, and begin to accelerate. While Ms. Williams testified that she checked her mirrors continuously while she was backing up, there is conflicting evidence in the record indicating that it isn't possible to see behind the truck even while utilizing the truck's mirrors. But even if it's possible, albeit difficult, the fact that Ms. Williams testified that after the initial impact she saw—through her mirrors—Mr. Le's red Toyota lurch in the direction of his house tends to suggest that, had she in fact been utilizing her mirrors with care, she would have seen his red car and have at least attempted to apply her brakes before hitting him. That she was entirely unaware of his vehicle until after the initial impact undermines her testimony that she was effectively utilizing her mirrors.

By contrast, Mr. Le did not breach his duty of ordinary care by backing into the street while the postal truck was stopped at the community mailbox. And even though his rear bumper was partly in Ms. Williams' side of the street after backing out of his driveway, because he came to a complete stop prior to the impact (a point neither party's expert disputes), the duty to yield at that point was on Ms. Williams, whose vehicle had begun to reverse and was still in motion. As Grand Prairie Police Officer Mitch Szempruch testified, drivers are legally permitted to back into the opposite lane of traffic in a residential area, provided it is safe to do so.[19] Because Mr. Le checked for oncoming traffic before backing into the street and saw none, he violated no duty owed to Ms. Williams, who was stopped at the mailbox when he backed out of his driveway, by safely backing into the street. Between the two drivers in this instance, it was Ms. Williams who owed Mr. Le a duty not to harm him. And it was Ms. Williams who breached that duty.

---

[19] Szempruch Test., Hr'g Tr. 49:6–16, ECF No. 137.

### iii.  Causation

A defendant is the legal proximate cause of an injury when her breach of duty is the cause-in-fact of the harm and the harm was reasonably foreseeable. *Stanfield v. Neubaum*, 494 S.W.3d 90, 97 (Tex. 2016). Cause-in-fact is established where the act or omission was a substantial factor in bringing about the injury, without which the harm would not have occurred but for that act or omission. *Id.* A harm is foreseeable where "a person of ordinary intelligence should have anticipated the danger created by the negligent act or omission." *Id.* (quoting *Doe v. Boys Club of Greater Dallas, Inc.*, 907 S.W.2d 472, 478 (Tex. 1995)).

Legal foreseeability does not require that the particular accident or peculiar chain of events should have been foreseen; "[a]ll that is required is that the injury be of such a general character as might reasonably have been anticipated; and that the injured party should be so situated with relation to the wrongful act that injury to him or to one similarly situated might reasonably have been foreseen." *Motsenbocker v. Wyatt*, 369 S.W.2d 319, 323–24 (Tex. 1963) (cleaned up); *Katy Springs & Mfg., Inc. v. Favalora*, 476 S.W.3d 579, 590 (Tex. App.—Houston 2015) (noting that foreseeability requires only that the general danger and not the particular sequence of events be foreseeable). Nor does the severity of the injury need to be foreseeable, for "[i]t is axiomatic that a tortfeasor takes a plaintiff as he finds him." *Id.* at 591; *see also Thompson v. Quarles*, 297 S.W.2d 321, 329–30 (Tex. App.—Galveston 1956) (noting in the context of foreseeability that "a defendant is chargeable for all the harm and suffering which his negligent act brought on even though the plaintiff's injuries were aggravated by his own predisposition or weakness").

Importantly, the need for subsequent medical treatment—that may or may not be successful—as a result of injuries incurred during a car accident has historically been considered

foreseeable under Texas law. "It has long been [] accepted and established in this State that one who wrongfully injures another is liable in damages for the consequences of negligent treatment by a doctor or surgeon selected by the injured person in good faith and with ordinary care." *Cannon v. Pearson*, 383 S.W.2d 565, 567 (Tex. 1964); *see also Henley v. Crawford*, No. 4-07-00104-CV, 2008 WL 34734, at *5 (Tex. App.—San Antonio Jan. 2, 2008, no pet.) (mem. op.) ("Medical treatment following a motor vehicle accident is certainly foreseeable, as is the fact that such medical treatment may or may not be successful."); *see also Jefferson Cty. v. Akins*, 487 S.W.3d 216, 233 (Tex. App.—Beaumont 2106, pet. denied) (affirming award of medical damages where the majority of the expenses resulted from "a physician whose treatment allegedly made [the plaintiff] worse") (alteration in original).

However, Texas law provides that "a new and independent, or superseding, cause may intervene between the original wrong and the final injury such that the injury is attributed to the new cause rather than the first and more remote cause . . . thus destroy[ing] any causal connection between the defendant's negligence and the plaintiff's harm." *Stanfield*, 494 S.W.3d at 97 (cleaned up).

Based on its earlier factual findings, the Court concludes that Ms. Williams' failure to exercise ordinary care was the proximate cause of Mr. Le's injuries. But for Ms. Williams' decision to back up her mail truck despite the vehicle's substantial blind spots, and but for her failure to maintain a proper lookout while doing so, she would not have struck Mr. Le's vehicle and set off the unfortunate chain of events. In other words, but for Ms. Williams' fault in causing the first collision that fractured Mr. Le's vertebra, Mr. Le's ultimately catastrophic spinal injury would not have occurred. The Court also concludes that the resulting injury was foreseeable because Ms. Williams should have seen that driving her postal vehicle in reverse posed a risk of

serious harm to others. Any driver of ordinary intelligence can be fairly expected to appreciate the danger of driving a motor vehicle in reverse down a residential street—particularly if the driver can't see what is in the street behind her. More importantly, Ms. Williams was in fact well aware of the risk of backing her mail truck because she had received training emphasizing the importance of not backing her postal vehicle unless absolutely necessary and, having been a delivery driver for several years at that point, knew very well that it was difficult, if not impossible, to see behind the mail truck.[20]

Ms. Williams did not need to anticipate the unusual sequence of events that resulted from her rearending Mr. Le's vehicle to have proximately caused his injuries. She did not need to predict that hitting his car would cause a chalk-stick fracture in his C6 vertebra, which in turn caused him to lose control of his lower extremities and resulted in him driving across his yard, through a fence, and into his neighbor's house. Rather, all Ms. Williams needed to foresee was the fact that driving her mail truck in reverse without the ability to see behind her might result in serious physical harm to another person. Indeed, injuring another driver or pedestrian—by causing a neck or back injury, for example—is a common danger of carelessly operating one's motor vehicle and rearending another driver, even at relatively low speeds.

Nor did Ms. Williams need to anticipate that the initial collision would ultimately result in Mr. Le becoming a quadriplegic. "It is axiomatic that a tortfeasor takes a plaintiff as he finds him." *Katy Springs*, 476 S.W.3d at 591. And that Mr. Le's ankylosing spondylitis made him particularly susceptible to traumatic spinal injury as a result of a relatively minor accident is of little import because "a defendant is chargeable for all the harm and suffering which his

---

[20] *See* note 9 *supra*.

negligent act brought on even though the plaintiff's injuries were aggravated by his own predisposition or weakness." *Thompson*, 297 S.W.2d at 329–30.

Finally, neither Mr. Le's own conduct nor Dr. Berchuck's purported mistreatment of Mr. Le's injuries breaks Ms. Williams' negligent chain of causation. First, the Court's prior finding that Mr. Le's C6 fracture and transient loss of neurologic function occurred on the initial impact precludes the Government's argument that Mr. Le's subsequent conduct—crashing into his neighbor's house—is a separate and intervening cause. A cause is intervening if the injury can be solely attributable to that cause. *See Stanfield*, 494 S.W.3d at 97.

Because the Court finds that Mr. Le's chalk-stick fracture occurred at the first impact, not the second, his subsequent involuntary actions do not break the chain of causation. Nor has the Government shown that the potential fact Mr. Le was unbelted at the time of the first collision (a fact that has not been established by a preponderance of the evidence) meaningfully contributed to this initial injury.[21] According to Plaintiffs' biomechanical and engineering expert, in a rear impact like the one that occurred between the two vehicles, whether the occupant was wearing a seatbelt is of little import because the impacted vehicle occupant's body would have moved backward into his seat, not forward. Thus, the utility of the seatbelt only contributes meaningfully in a frontal impact, not a rearend impact like the first collision that occurred here.[22] And though it has raised the argument that Mr. Le was not wearing shoes during the accident (another fact that has not been established by a preponderance of the evidence), the Government offers no evidence upon which the Court can find that such failure caused or contributed to causing his injuries.[23] For these reasons, the Court concludes that Mr. Le was not contributorily negligent.

---

[21] *See* note 3 *supra*.

[22] DeLonga Video Dep. Test., at 00:34:10 (on file with the Court).

[23] *See* note 4 *supra*.

Second, and leaving aside the separate question whether Dr. Berchuck committed medical malpractice for purposes of apportioning him third-party responsibility, which is addressed further below, the Court concludes that it is foreseeable that a plaintiff may need to seek medical care for a neck injury following even a minor traffic accident. *Henley*, 2008 WL 34734, at *5 (mem. op.) ("Medical treatment following a motor vehicle accident is certainly foreseeable, as is the fact that such medical treatment may or may not be successful."). "It has long been [] accepted and established in this State that one who wrongfully injures another is liable in damages for the consequences of negligent treatment by a doctor or surgeon selected by the injured person in good faith and with ordinary care." *Cannon*, 383 S.W.2d at 567. In sum, because her negligent conduct was both the cause-in-fact of Mr. Le's injuries, and the risk of causing him physical harm was foreseeable, Ms. Williams was the proximate cause of his injuries.

### iv.  Damages

Having concluded that Ms. Williams' breach of her duty of care proximately caused Mr. Le's injuries, the Court turns to the remaining element of damages. Mr. Le and his wife have indisputably suffered substantial harm as a consequence of the accident on May 4, 2018 and Mr. Le's foreseeable resulting injuries. That harm includes past and future medical expenses, loss of income, and intangible harms such as pain and suffering, disfigurement, mental anguish, and others. The Government's primary argument to rebut this element is that Plaintiffs' claims for damages must fail as a matter of law because they cannot meet their burden of proof on the prior elements of negligence. The Government specifically contends that Plaintiffs cannot demonstrate how their damages were caused by or are attributable to the first impact (the only impact in

which the United States was directly involved) as opposed to the second impact and subsequent surgery. As the discussion above demonstrates, the Court disagrees.

Under Texas law, "a plaintiff may recover medical damages proximately caused by a tortious event that aggravated a pre-existing medical condition." *Wal-Mart Stores Tex., LLC v. Autrey*, 6:19-00095-CV, 2021 WL 1216890, at *10 (Tex. App.—Texarkana Apr. 1, 2021, no pet.) (citing *Wal-Mart Stores Tex., LP v. Crosby*, 295 S.W.3d 346, 352–53 (Tex. App.—Dallas 2009, pet. denied)). As discussed above, the Court accepts Plaintiffs' experts' testimony regarding injury causation and aggravation of Mr. Le's pre-existing medical condition and will briefly address each category of Plaintiffs' requested damages in turn.

### 1.  Past Medical Expenses

To recover for past medical expenses, a plaintiff must prove that the expenses were necessary to treat the injury, were reasonable in amount, and the expenses were paid or incurred by or on behalf of the plaintiff. Tex. Civ. Prac. & Rem. Code § 41.0105; *Texarkana Mem'l Hosp., Inc. v. Murdock*, 946 S.W.2d 836, 839–40 (Tex. 1997). The Court accepts the parties' stipulation that Mr. Le incurred reasonable and necessary medical expenses for past medical treatment in the amount of **$1,704,123.29**.

### 2.  Future Medical Expenses

To recover future medical expenses, a plaintiff must show there is a "reasonable probability" that the expenses resulting from the injuries he sustained will be necessary in the future and the reasonable cost of such care. *Rosenboom Mach. & Tool, Inc. v. Machala*, 995 S.W.2d 817, 828 (Tex. App.—Houston [1st dist.] 1999, pet. denied). A factfinder may determine reasonable future medical expenses based on: (1) the injuries suffered; (2) the medical care

23

rendered before trial; (3) the injured party's progress toward recovery under the treatment received; and (4) the condition of the injured party at trial. *Id.*

Plaintiffs presented the expert testimony of Dr. Jason Marchetti, a life care planner who is board certified by the American Board of Physical Medicine & Rehabilitation. Dr. Marchetti reviewed Mr. Le's past medical treatment records and performed a medical history and physical examination of Mr. Le at the Le home. Dr. Marchetti authored a life care plan detailing Mr. Le's future medical, environmental and transportation needs for the injuries he sustained as a result of the motor vehicle collision that occurred on May 4, 2018. If Mr. Le receives the extensive medical care he needs, Dr. Marchetti estimates that Mr. Le will live approximately 20 additional years.

The Government presented the expert testimony of Dr. Hooman Sedighi, a board-certified physiatrist (a physician specializing in physical medicine and rehabilitation). Dr. Sedighi discussed Mr. Le's life expectancy, which he estimated is approximately 12.6 additional years, and the reasonableness and necessity of medical services based on Mr. Le's anticipated future medical needs. Dr. Sedighi also testified that Mr. Le's noncompliance with recommended medical treatment has resulted in increased hospital admissions over the past few years, and he needs a higher level of care than he can receive at home, necessitating residence in a skilled nursing facility for around-the-clock medical treatment if required. He also testified that Mr. Le's spinal cord injury, current health status, and preexisting ankylosing spondylitis will significantly reduce his life expectancy from that of an average male. The Government also offered the testimony of Wendy Knau, a registered nurse and certified professional coder, who testified regarding the actual usual, customary, and reasonable costs of future medical services and treatment, as compared to the costs outlined in Plaintiffs' proposed life care plan.

Having heard the testimony and weighed the relative credibility of these experts, the Court largely accepts the opinions and testimonies of Dr. Sedighi and Ms. Knau with respect to Mr. Le's future medical expenses. The Court accepts Dr. Sedighi's opinion that Mr. Le is likely to live an additional 12.6 years.

The Government's proposed future medical expenses are based in part on Dr. Sedighi's review and revisions to Dr. Marchetti's Original Life Care Plan (dated Dec. 14, 2022), in which he laid out his own estimation of Mr. Le's future medical care needs. Dr. Sedighi made two different recommendations regarding future medical care: one recommendation based on in-home care and a second recommendation based on care offered in a skilled nursing facility. Ms. Knau then reviewed Dr. Sedighi's modifications to the care plan and provided an adjusted estimate of the usual, customary, and reasonable ("UCR") costs of those services. In doing so, Ms. Knau used the industry standard seventy-fifth percentile cost for services to calculate the UCR for Mr. Le's anticipated future medical expenses, rather than the eightieth percentile used by Dr. Marchetti.[24]

The following chart was prepared by Ms. Knau and identifies Dr. Marchetti's recommended future medical expenses (column one); Dr. Sedighi's recommended medical expenses for in-home care medical expenses (column two); Dr. Sedighi's recommended medical expenses for care in a skilled nursing facility (column three):

[intentionally left blank]

---

[24] A seventy-fifth percentile UCR is a metric which indicates that the cost of a specific medical service is higher than seventy-five percent of comparable medical services in the same geographic region and lower than twenty-five percent of comparable services in the region.

|  | No modifications to Marchetti Care Plan | Modifications to Marchetti Care Plan with Home Care | Modifications to Marchetti Care Plan with Skilled Nursing Care |
|---|---|---|---|
| Sporadic Costs (durable medical equipment, inpatient services, van) based on 20yr calculation | | | |
|  | $629,159.15 | $559,392.60 | $556,792.60 |
| Ongoing Costs (ongoing medical services, equipment, and supplies) | | | |
| 1 year | $300,217.02 | $200,798.45 | $153,658.55 |
| 11 Years | $3,303,387.22 | $2,208,782.95 | $1,690,244.05 |
| 12.6 Years | $3,782,734.45 | $2,530,060.47 | $1,936,097.73 |
| 20 Years | $5,313,416.28 | $3,699,447.41 | $2,745,133.41 |
| TOTAL | | | |
| 1 year | $929,276.17 | $760,191.05 | $710,451.15 |
| 11 Years | $3,931,546.37 | $2,768,175.55 | $2,247,036.65 |
| 12.6 Years | $4,411,893.60 | $3,084,453.07 | $2,492,890.33 |
| 20 Years | $5,942,575.43 | $4,258,840.01 | $3,301,926.01 |

Def.'s Ex. 108. For purposes of calculating this damage award, the Court relies on Dr. Sedighi's recommendation for in-home medical services (column two) given his testimony that the goal for long-term patient care is to return the patient to an in-home care environment and that, with these recommended services, Mr. Le could live a longer and higher quality life at home with his family.[25] Comparing column one and column two, it is clear that Dr. Sedighi's recommendations result in an approximate 11.1% reduction of Dr. Marchetti's projected sporadic costs and a 33.1% reduction of his projected ongoing costs.[26]

Importantly, the Court also admitted Dr. Marchetti's Amended Life Care Plan (dated Feb. 24, 2023), which he updated after receiving and reviewing an additional 10,000 pages of Mr. Le's medical records. But while the Government called Dr. Sedighi to testify that he disagreed with the frequency of services recommended in Dr. Marchetti's Amended Plan, the Government did not ask Dr. Sedighi to prepare a new report or have Ms. Knau provide adjusted costs based on that amended report. Therefore, the only concrete numbers before the Court are these experts' adjustments to Dr. Marchetti's Original Plan, which are set out above. Because the Government

[25] *See* Sedighi Test., Hr'g Tr. 123:17–133:18, ECF No. 140.
[26] $559,392.60 / $629,159.15 = .889 (for a reduction of approximately 11%); $2,530,060.47 / $3,782,734.45 = .669 (for a reduction of approximately 33%).

did not offer recommended adjustments to Dr. Marchetti's Amended Plan, the Court must determine the appropriate future medical expenses damages award by relying in part on Dr. Marchetti's Amended Life Care Plan and in part on Dr. Sedighi's and Ms. Knau's expert opinions with respect to Dr. Marchetti's Original Life Care Plan.[27]

The Court reaches it future medical expenses damages calculation by several steps. First, the Court accepts Dr. Marchetti's Amended Plan and its estimation of expenses as the numerical starting point. Based on a 12.6-year life expectancy, Dr. Marchetti's Amended Plan estimates future medical expenses to cost $8,708,061.00.[28] Second, the Court reduces Dr. Marchetti's amended estimation of costs by the percentage that the Government's experts reduced his *original* estimation of costs—i.e., by reducing sporadic costs by 11.1% and ongoing costs by 33.1%. It does this by dividing the total $8,708,061.00 into sporadic and ongoing costs.[29] The Court simply accepts Ms. Knau's calculation of Dr. Marchetti's sporadic costs to be $629,159.15.[30] The Court then subtracts these sporadic costs from $8,708,061.00 to identify the remaining ongoing costs in the amount of $8,078,901.85. Next, the Court reduces the sporadic costs by approximately 11.1% to $559,392.60[31] and ongoing costs by 33.1% to $5,404,785.34.[32]

---

[27] The Court finds this to be the most appropriate method for calculating adjusted costs because Dr. Sedighi testified that he agreed with the necessity of nearly all of the medical services recommended in Dr. Marchetti's Amended Plan but disagreed with the recommended frequency of those services; he also testified that his methodology for reviewing Dr. Marchetti's Original and Amended plans would remain the same. Sedighi Test., Hr'g Tr. 123:17–133:18, ECF No. 140.

[28] The parties have stipulated to this present-day value calculation.

[29] Because the Court is unaware of any evidence in the record indicating which specific costs Ms. Knau included to reach her "sporadic costs" total, and because it cannot therefore recalculate the sporadic costs using Dr. Marchetti's Amended Plan, the Court takes this number from Ms. Knau's original price adjustment chart. See Knau chart *supra* (column one). However, because these sporadic costs include items such as a wheelchair van and home modifications, and are not recurring, the Court is satisfied that this portion of the total estimate is not likely to have changed substantially between Dr. Marchetti's Original Plan and Amended Plan.

[30] See Knau chart *supra* (sporadic costs, column two); *see also* note 26 *supra* (identifying percentage reductions, rounded to the thousandth decimal).

[31] $8,078,901.85 x .669 = $5,404,785.34; *see also* note 26 *supra* (identifying percentage reductions, rounded to the thousandth decimal).

Finally, the Court adds these two numbers to reach its total damages award.

In sum, using the present-day value calculations of Dr. Marchetti's Amended Life Care Plan, adjusted to best reflect the opinions and recommendations of the Government's expert witnesses Dr. Sedighi and Ms. Knau, the Court determines that Plaintiffs are entitled to future medical expenses in the amount of **$5,964,177.94**.

***Failure to Mitigate.*** As with damages of every kind, an injured party has a duty to mitigate his damages and cannot recover those that could have been avoided had the injured party made an effort to mitigate his losses as a person of ordinary prudence under similar circumstances would have done. *Pinson v. Red Arrow Freight Lines, Inc.*, 801 S.W.2d 14, 15 (Tex. App.—Austin 1990, no writ). However, the burden of proof as to whether the injured party failed to mitigate, and the degree to which that failure increased damages, is on the party that caused the loss. *Id.* at 16.

Though the Government contends that Mr. Le failed to mitigate his future medical expenses by missing medical appointments and neglecting to follow-up with some of his physicians and treatment protocols, the Government has not carried its burden to show that, in doing so, Plaintiffs failed to act as persons of ordinary prudence would have under the same or similar circumstances. As their life care planner testified, Plaintiffs missed many of those appointments as a result of their inability to pay for the costs of getting Mr. Le there—by ambulance or wheelchair van, since they do not have a means of transporting him. Instead, Mr. Le's family members would often visit his physician *on his behalf* in an effort to obtain the medical information he needed while providing the best care for him that they knew how despite their lack of professional medical training. Thus, the Court finds that Plaintiffs acted as prudently

---

[32] *Id.*

as persons experiencing similar physical and financial barriers would have acted under the circumstances.

### 3.   Loss of Earning Capacity, Past and Future

In a personal injury case, a plaintiff may recover damages for past and future loss of earning capacity as a result of the accident, as measured by loss of actual income the plaintiff was earning prior to the injury. *Koko Motel, Inc. v. Mayo*, 91 S.W. 3d 41, 51 (Tex. App.—Amarillo 2022, pet. denied); *Holcombe v. United States*, 584 F. Supp. 3d 225, 286 (W.D. Tex. 2022). The Court accepts the parties' stipulation that Mr. Le has lost wages and lost earning capacity resulting from his injuries in the amount of **$590,178.50**.

### 4.   Intangible Damages

In FTCA cases, it is within the factfinder's discretion to award intangible damages that are otherwise available under state law. *Lebron v. United States*, 279 F.3d 321, 325–26 (5th Cir. 2002). In doing so, the district court looks to comparable and previously reported damage awards to determine the appropriate amount for a claimant's recovery. *Id.* at 326.

### a.   Physical Pain and Suffering, Past and Future

A factfinder may award damages for physical pain consciously suffered and experienced. *S. Pac. Transp. Co. v. Luna*, 730 S.W.2d 36, 38 (Tex. App.—Corpus Christi 1987). Evidence of past physical pain may be offered by testimony or other evidence, *Hospadales v. McCoy*, 513 S.W.3d 724, 742 (Tex. App.—Houston [1st Dist.] 2017, no pet.), and the law assumes physical pain results from a serious injury. *See City of Tyler v. Likes*, 962 S.W.2d 489, 495–96 (Tex. 1997). To prove future physical pain and suffering, the evidence must show there is a reasonable probability the injury will continue to affect the plaintiff in the future. *See Marvelli v. Alston*, 100 S.W.3d 460, 482–83 (Tex. App.—Fort Worth 2003, pet. denied). And damages for future pain

may be extrapolated from the damages awarded for past pain. *Turner v. Duggin*, 532 S.W.3d 473, 485–86 (Tex. App.—Texarkana 2017, no pet.). Because physical pain and suffering is inherently subjective, and there are no guidelines to assess the monetary equivalent of such injuries, the factfinder has immense discretion in awarding such damages. *See Texarkana Mem'l Hosp., Inc.*, 946 S.W.2d at 841.

Based on the testimony and evidence offered at trial regarding his physical pain as a result of his injuries and the Court's observation of Mr. Le himself, the Court determines that Mr. Le's damages for physical pain and suffering in the past, beginning May 4, 2018 and continuing to date, are **$1,500,000.00**. Mr. Le's damages for physical pain and suffering in the future, based on the Court's earlier acceptance of his expected life span, are determined to be **$3,900,000.00**.[33]

### b.    Mental Anguish, Past and Future

A plaintiff may recover damages for mental anguish resulting from a serious or traumatic bodily injury, and in such cases the law permits the factfinder to infer that the plaintiff has suffered this kind of harm. *Likes*, 962 S.W.2d at 495–96; *Holcombe*, 584 F. Supp. 3d at 287. Mental anguish damages are also recoverable for aggravation of pre-existing medical conditions. *Texas Coors, Inc. v. Morales*, 948 S.W.2d 948, 952–53 (Tex. App.—San Antonio 1997, no pet.).

Based on the testimony offered at trial regarding his mental anguish as a result of his injuries, including his depression and suicidality at certain periods, Mr. Le's damages for mental anguish in the past, beginning May 4, 2018 and continuing to date, are determined to be

---

[33] *See, e.g.*, *Foradori v. Harris*, 523 F.3d 477, 505–06 (5th Cir. 2008) (affirming judgment of $10,000,000 in damages for physical pain and suffering and mental anguish for quadriplegic with phantom pain, infections, and bed sores); *Denham v. United States*, 834 F.2d 518 (5th Cir. 1987) (affirming judgment of $500,000 [or $1,750,000 when adjusted for inflation] for physical pain and suffering to quadriplegic).

**$750,000.00**. Mr. Le's damages for mental anguish in the future are determined to be **$500,000.00**.[34]

### c. Impairment, Past and Future

In a personal injury case, a plaintiff can recover damages for past and future physical impairment. *Blankenship v. Mirick*, 984 S.W. 2d 771, 777 (Tex. App.—Waco 1999, pet. denied). Physical impairment is defined, somewhat abstractly, as including "loss of enjoyment of life." *Golden Eagle Archery, Inc. v. Jackson*, 116 S.W.3d 757, 772 (Tex. 2003). Physical impairment encompasses the inability to participate in sports, hobbies, or other recreational activities that comprised part of the injured party's former lifestyle. *Katy Springs*, 476 S.W.3d at 599. To be recoverable as damages, physical impairment must be substantial and extend beyond pain and suffering, mental anguish or lost earning capacity. *Golden Eagle Archery*, 116 S.W.3d at 772. And because impairment damages are inherently speculative, factfinders have discretion in determining such awards. *See Ononiwu v. Eisenbach*, 624 S.W.3d 37, 44 (Tex. App.—Houston [1st Dist.] 2021).

Based on the testimony offered at trial regarding his inability to participate in sports, hobbies, or other recreational activities as a result of his injuries, Mr. Le's damages for physical impairment in the past, beginning May 4, 2018 and continuing to date, are determined to be **$2,000,000.00**. Mr. Le's damages for physical impairment in the future, and based on the Court's earlier acceptance of his expected life span, are determined to be **$5,200,000.00**.[35]

---

[34] *See, e.g.*, *N.N. v. Ist. For Rehab. & Rsch.*, 234 S.W.3d 1, 18 (Tex. App. 2006), *judgment withdrawn*, No. 01-02-01101-CV, 2007 WL 4279613 (Tex. App. Dec. 5, 2007) (affirming award of $650,000 [or $950,000 when adjusted for inflation] for future mental anguish as a result of tortious negligence).

[35] *See, e.g.*, *Press Energy Servs., LLC v. Ruiz*, 650 S.W.3d 23, 55 (Tex. App. 2021) (affirming award of $1,750,000 for physical impairment resulting from a severed ear, burns, and scarring on hands and shoulders).

### d.     Disfigurement, Past and Future

A personal injury plaintiff may recover damages for past and future disfigurement. *Wal-Mart Stores v. Tinsley*, 998 S.W.2d 664, 673 (Tex. App.—Texarkana 1999, pet. denied), which is recognized as a separate element of recovery from pain and suffering, mental anguish, and loss of earning capacity. *Goldston Corp. v. Hernandez*, 714 S.W.2d 350, 352-53 (Tex. App.—Corpus Christi 1986, writ ref'd n.r.e.). The term disfigurement is "defined as that which impairs or injures the beauty, symmetry, or appearance of a person or thing or that which renders unsightly, misshapen, imperfect, or deformed in some manner." *Goldman v. Torres*, 341 S.W.2d 154, 160 (Tex. 1960). Disfigurement includes contorted limbs and other deformities. *Baptist Mem'l Hosp. Sys. v. Smith*, 822 S.W.2d 67, 80 (Tex. App.—San Antonio 1981, writ denied) (overruled in part on other grounds). Such damages are also available for future disfigurement, which relates to recovery for future embarrassment caused by the disfigurement. *Holcombe*, 584 F. Supp. 3d at 288–89.

Based on the evidence offered at trial, the Court determines that Mr. Le has and will continue to suffer damages due to disfigurement as a result of his injuries. Mr. Le's damages for disfigurement in the past, beginning May 4, 2018 and continuing to date, are determined to be **$500,000.00**. Mr. Le's damages for disfigurement in the future, based on the Court's earlier acceptance of his expected life span, are determined to be **$1,300,000.00**.[36]

### e.     Loss of Consortium, Past and Future

A plaintiff spouse can recover for loss of consortium when their marital partner's injuries were caused by the negligence of another party. *Whittlesey v. Miller*, 572 S.W.2d 665, 667–68 (Tex. 1978). Loss of consortium concerns the emotional and intangible elements of a marriage

---

[36] *See, e.g.*, *Press Energy Servs., LLC*, 650 S.W.3d at 56 (affirming award of $500,000, but acknowledging awards up to $1,000,000, for disfigurement).

relationship, including love, affection, protection, comfort, companionship, care, society, and sexual relations. *Id.* Recovery for loss of consortium is derivative of an injured person's claim. *Motor Express, Inc. v. Rodriguez*, 925 S.W.2d 638, 640 (Tex. 1996). Given the subjectivity of this category of damages, the factfinder may apply its own knowledge and experience to estimate the value of the loss of consortium. *Badall v. Durgapersad*, 454 S.W.3d 626, 638 (Tex. App.—Houston [1st Dist.] 2014, pet. denied).

Based on her testimony offered at trial regarding the change in their marital relationship following Mr. Le's accident, and in light of the particular facts and circumstances of this case, the Court determines that Dung Le's damages for loss of consortium in the past, beginning May 4, 2018 and continuing to date, are **$500,000.00**. Dung Le's damages for loss of consortium in the future are **$2,000,000.00**.[37]

### f.    Loss of Services, Past and Future

A spouse can recover for loss of services of the injured spouse. *Whittlesey*, 572 S.W.2d at 666. "Services" generally means the performance by a spouse of household and domestic duties. *Id.* If there is no evidence of the value of household services that the injured spouse can no longer perform the factfinder may infer the value of the loss from its own knowledge and experience. *Critical Path Res. v. Cuevas*, 561 S.W.3d 523, 566 (Tex. App.–Houston [14th Dist.] 2018, pet. filed Mar. 6, 2019). Damages for loss of services are derivative of a primary tort claim. *Allen v. Sherman Operating Co., LLC*, 520 F. Supp. 3d 854, 861 (E.D. Tex. 2021).

Based on the testimony offered at trial, the Court determines that Dung Le's damages for loss of services in the past, beginning May 4, 2018 and continuing to date, are **$21,000.00**. Dung

---

[37] *See, e.g.*, *Puga v. RCX Sols., Inc.*, 922 F.3d 285, 297–98 (5th Cir. 2019) (affirming award of $1,800,000 in past damages and $409,000 in future damages for loss of consortium); *Reeder v. Allport*, 218 S.W.3d 817, 821–22 (Tex. App. 2007) (affirming award of $750,000 in past damages and $1,000,000 in future damages for lost of consortium).

Le's damages for loss of services in the future are **$84,000.00**.[38]

*     *     *     *

In sum, the Court holds that Plaintiffs have carried their burden to prove by a preponderance of the evidence that Defendant United States of America, through the negligent acts of USPS employee Jill Williams, caused their injuries. Because the Court has apportioned no fault to Mr. Le, Plaintiffs are not barred from recovering against the United States. Based on the Court's determination of damages above, Plaintiff Michael Le is entitled to recover **$23,908,479.73** in past and future medical expenses, loss of earnings, and intangible damages; Plaintiff Dung Le is entitled to recover **$2,605,000.00** in loss of consortium and loss of services, past and future.

### v. Third-Party Responsibility

Having determined that the United States, through the acts of its employee Ms. Williams, is liable for negligently causing Mr. Le's neck fracture, the Court turns next to the question of whether Dr. Berchuck should be considered proportionately responsible for Mr. Le's ultimate injury of quadriplegia.[39] A responsible third-party is "any person who is alleged to have caused or contributed to causing in any way the harm for which recovery of damages is sought, whether by negligent act or omission [or] by other conduct or activity that violates an applicable legal standard or by any combination of these." Tex. Civ. Prac. & Rem. Code § 33.011(6). Dr. Berchuck has been properly designated as a responsible third-party in this case. Here, the

---

[38] *See, e.g.*, *EDCO Prod., Inc. v. Hernandez*, 794 S.W.2d 69, 77 (Tex. App. 1990), *writ denied* (Nov. 14, 1990) (affirming award of $350 per month for loss of services).

[39] Those who are deemed proportionately responsible under Tex. Civ. Prac. & Rem. Code § 33.003(a) are not liable for their harmful conduct. Rather, their fault is considered solely for purposes of allocating percentages of fault among multiple parties, with the potential to reduce a named defendant's liability in damages. Here, if the Government can show that Dr. Berchuck was partly responsible for causing Mr. Le's quadriplegia, they can reduce their potential liability by Dr. Berchuck's contributory percentage of fault.

Government alleges Dr. Berchuck should be held proportionately responsible for Mr. Le's injuries based on his negligent treatment of Mr. Le during and after surgery (i.e., for medical malpractice).

To prevail on this claim and thereby reduce its liability, the Government must prove by a preponderance of the evidence "(1) the physician's duty to act according to an applicable standard of care; (2) the physician's breach of that standard of care; (3) injury; and (4) causation." *Hannah v. United States*, 523 F.3d 597, 601 (5th Cir. 2008). The relevant standard of care must be established through expert testimony, with a focus on the community in which the treatment took place. *Id.*; *Quijano v. United States*, 325 F.3d 564, 568 (5th Cir. 2003).

The parties dispute the applicable legal standard by which Dr. Berchuck's medical treatment of Mr. Le should be measured. The  Government contends all they must show is that Dr. Berchuck acted negligently in his treatment of Mr. Le during and after surgery while Plaintiffs assert that, because Dr. Berchuck was rendering emergency medical treatment, the applicable standard is  gross negligence.[40] For the following discussion only, the Court will assume the general negligence standard applies. The Court does not need to resolve whether the applicable legal standard is negligence or gross negligence, however, because the Government cannot prove causation. Because the Government cannot prove this essential element of their claim, Dr. Berchuck cannot be held proportionately responsible for Mr. Le's quadriplegia, and the Court need not reach the remaining issues with respect to medical malpractice.

In attempting to assign third-party responsibility, the Government offered the testimony of board-certified orthopedic surgeon, Dr. Colman, to discuss how Dr. Berchuck's conduct caused Mr. Le's quadriplegia and related medical injuries. First, the Government argues Dr.

---

[40] *See generally* Pls.' Suppl. Br. Regarding Third-Party Respons. (ECF No. 131); Def.'s Suppl. Br. in Response (ECF No. 132); Pls.' Reply (ECF No. 134).

Berchuck is at fault for negligently failing to decompress and stabilize Mr. Le's spine and by providing substandard post-operative care, causing Mr. Le's permanently loss of neurologic function. Second, the Government contends Dr. Berchuck is at fault for negligently failing to detect and treat Mr. Le's esophageal tear that developed into a permanent fistula (chronically draining wound that won't heal) in Mr. Le's neck.

The Government has not demonstrated that Dr. Berchuck's purportedly negligent conduct caused or contributed to cause either injury. Causation must be established by expert testimony based on reasonable medical probability, not mere conjecture, speculation, or possibility. *Gunn v. McCoy*, 489 S.W.3d 75, 84 (Tex. App.—Houston [14th Dist.] 2016) *aff'd*, 554 S.W. 645 (Tex. 2018). But "as Texas law makes clear . . . , bad outcomes are not, alone, evidence of negligence." *Bustos v. United States*, No. 4:19-cv-427, 2021 WL 1192154, at *5 (N.D. Tex. 2021) (citing *Senior Care Ctrs., LLC v. Shelton*, 459 S.W.3d 753, 758–59 (Tex. App.—Dallas 2015, no pet.).

***Permanent Quadriplegia.*** The Government's theory is that Mr. Le's quadriplegia became permanent after Dr. Berchuck permitted him to leave the operating room without adequate spinal-cord decompression or stabilization and because the doctor failed to provide adequate post-operative care.[41] Importantly, while he says that "[t]he quadriplegia absolutely occurred in its entirety during this trip to the operating room," Dr. Colman specifically testified that at every stage of surgery—including the moment Mr. Le was flipped over and neuromonitoring signals were lost—Dr. Berchuck met the requisite standard of care.[42]

Given the their expert's testimony, up until the point at which Mr. Le left the operating room, no negligent conduct on the Dr. Berchuck's part can be said to have caused the

---

[41] While the Government's original theory seemed to be that Dr. Berchuck's negligence *during* spinal surgery was the cause of Mr. Le's quadriplegia, and likely because their expert's trial testimony clearly precludes that theory, they now focus on Dr. Berchuck's post-operative treatment.

[42] Colman Test., Hr'g Tr. 107:14–18, ECF No. 136; *id.* at 95:7–107:6 (testifying that at every stage of the operation Dr. Berchuck met the standard of care).

quadriplegia. In Dr. Colman's view, "the deviation from the standard of care was [when the] patient left the operating room not adequately stabilized and not adequately decompressed."[43] The parties' experts disagree about whether the measures Dr. Berchuck took by using the interior plate and Halo vest actually stabilized and decompressed the spinal cord. But that dispute is not dispositive because, even if true, the Government still cannot prove causation. With regard to causation of the permanent quadriplegia, Dr. Colman opined that while "it's impossible to know [] for sure," there was "a chance . . . at least possibly," that Mr. Le could have recovered his neurologic function had he been provided better spinal stabilization.[44] As he testified at trial:

> [There is] *at least a chance* that what they saw in the operating room was not, at that point permanent, but as the spine dislocated and sat that way in the ICU in the days following, that that's when the injury became permanent. I think there is a *likely chance* that that was the case.
>
> . . . *If* the neurologic injury sustained at the time of the flip was not in fact a permanent transection of the cord or something like that and in fact was a reversible injury, *which is very possible*, then the failure to provide stability and decompression absolutely led to the permanency of the neurologic injury.[45]

Here, Dr. Colman opines that there is a "chance" (i.e., a mere fortuitous occurrence) that the permanency of the quadriplegia did not occur in surgery and, therefore, a "likely chance" that the injury then became permanent during post-operative treatment. But that is true, he qualifies, only "if" the intra-operative flip—which he admits met the standard of care—didn't render Mr. Le a permanent quadriplegic instantaneously, which he says is "possible." Thus, Dr. Colman's expert opinion is that if the flip did not cause permanent quadriplegia, which he says is possible, then there is a chance the post-operative care did.

Though an expert's opinion need not be stated in terms of medical certainty, its conclusion must rest on a degree of medical probability. Dr. Colman's conclusion does not meet

---

[43] *Id.* at 75: 2–4.
[44] *Id.* at 107:21–24.
[45] *Id.* at 108:2–7 (emphasis added).

that threshold. Instead, he offers an equivocal opinion couched in terms of "chance" (i.e., a mere fortuitous occurrence) and "possibility."[46] Neither is a sufficient basis upon which a finder of fact may find legal causation and hold a third-party responsible. For this reason, the Government's argument that that Dr. Berchuck's negligence caused or contributed to Mr. Le's permanent quadriplegia fails.

*Esophageal Fistula.* The Government's argument that Dr. Berchuck's post-operative treatment caused Mr. Le's esophageal tear suffers the same flaw. Here, the Government argues that Dr. Berchuck was negligent in his post-operative treatment of Mr. Le by failing to timely detect and treat an esophageal tear that ultimately caused chronic infection and developed into a fistula, requiring Mr. Le's permanent use of a feeding tube. Dr. Colman provided unrebutted testimony that it is within the purview of a spinal surgeon to recognize an esophageal tear, which is generally evident from a front-of-neck infection like the one Mr. Le developed. He also opined that if such tears are detected early, they "can be managed" and that Dr. Berchuck's failure to recognize and treat the esophageal tear earlier on "led to a worse outcome" for Mr. Le.[47]

To hold Dr. Berchuck responsible as a third-party, his causing or contributing to the injury must be established based on reasonable medical probability (i.e., more likely than not). *Gunn*, 489 S.W.3d at 84. But Dr. Colman did not say that if Dr. Berchuck caught the esophageal tear sooner then, in all likelihood, Mr. Le's resulting infections and ultimate need for a feeding tube would have been avoided. Rather, Dr. Colman's opined that delayed detection led to a "worse outcome." How much worse? We're not told. But "bad outcomes are not, alone, evidence of negligence." *Bustos*, 2021 WL 1192154, at *5. And instead of demonstrating causation in

---

[46] Dr. Colman's modification of "chance" with "likely" (i.e., "likely chance") does not save his opinion. Stating that there's a likely chance Y occurred on the chance that X occurred previously is a far cry from probability.
[47] Colman Test., Hr'g Tr. 84:8–85:1, ECF No. 136.

terms of reasonable medical probability, Dr. Colman's testimony invites the Court to speculate about the end result. In sum, the Government has not carried its burden to show, based on reasonable medical probability, that Dr. Berchuck is responsible for Mr. Le's esophageal fistula.

Even if Dr. Colman's testimony is sufficient to prove causation, the Government hasn't produced evidence regarding the applicable standard of care necessary to determine whether Dr. Berchuck breached his duty with respect to this injury. While Dr. Colman testified that it is the spinal surgeon's role to recognize an esophageal tear and that delayed detection can lead to bad outcomes, he offers no opinion about how soon such an injury *should* be recognized. When, based on the standards of the medical community in Dallas, must a prudent spinal surgeon detect an esophageal tear to have acted in accordance with the appropriate level of care? *Quijano*, 325 F.3d at 568. Again, we are not told. For this reason also, the Government has not carried their burden to show third-party responsibility on the part of Dr. Berchuck.

## III. CONCLUSION

For the foregoing reasons, the Court rules against the Defendant the United States of America and in favor of Plaintiffs on their claim of negligence. Because the Court concludes that the Government has failed to carry its burden to show that Mr. Le  and Dr. Berchuck negligently caused or contributed to his injuries, the United States is therefore jointly and severally liable for all of the damages suffered by Plaintiffs. Accordingly, the Court determines that Plaintiff Michael Le is entitled to recover **$23,908,479.73** in past and future medical expenses, loss of earnings, and intangible damages from the United States; Plaintiff Dung Le is entitled to recover **$2,605,000.00** in loss of consortium and loss of services, past and future, from the United States.

Defendant's motion for judgment as a matter of law, offered at trial, is **DENIED**. Separate final judgment shall issue.

**SO ORDERED** this **24th day** of **July, 2023**.


Reed O'Connor
UNITED STATES DISTRICT JUDGE